UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JULIE L. SHAFER, *on her own behalf*
*and on behalf of her minor child*, L.G.D.,

        Plaintiff,                           Case No. 1:10-cv-1170

v.                                        HON. JANET T. NEFF

WHITEHALL DISTRICT SCHOOLS and
WHITEHALL DISTRICT SCHOOLS
BOARD OF EDUCATION,

        Defendants.

_____/

WHITEHALL DISTRICT SCHOOLS,

        Plaintiff,                           Case. No. 1:10-cv-1176

v.

J.S., *on behalf of her son*, L.D.,

        Defendant.

_____/

## OPINION

These cases are brought pursuant to the Individuals with Disabilities Education Act (IDEA),[1]

20 U.S.C. § 1400 *et seq.*, concerning services for a seven-year-old student, L.G.D. (also referenced

as L.D. and in the record), with multiple disabilities.  Pending before the Court is Plaintiff Julie

---

[1]"Congress amended the IDEA in the Individuals with Disabilities Education Improvement
Act of 2004, Pub. L. No. 108–446, 118 Stat. 2647 ("IDEIA"), which took effect on July 1, 2005."
*G.J. v. Muscogee Cnty. Sch. Dist.,* 668 F.3d 1258, 1261 n.1 (11th Cir. 2012).  Because the
administrative record and decision in this case refer to the IDEA, this Opinion references the Act
accordingly.

Shafer's ("Plaintiff") Motion for Summary Judgment (Dkt 63).[2]  Defendants Whitehall District

Schools ("the District") and Whitehall District Schools Board of Education ("Defendants") have

filed a Response (Dkt 65), and Plaintiff has filed a Reply (Dkt 64).  Having fully considered the

parties' briefs and the extensive record, the Court concludes that oral argument is unnecessary to

resolve the pending motions.  *See* W.D. Mich. LCivR 7.2(d).  The Court denies Plaintiff's motion.

## I. BACKGROUND

These cases follow an administrative decision and order on August 31, 2010, after a seven-

day hearing,[3] finding in favor of the District in part and in favor of Plaintiff in part.  The

Administrative Law Judge (ALJ)[4] concluded that the District denied L.G.D. a free appropriate public

education (FAPE) by failing to conduct an appropriate multi-disciplinary evaluation of L.G.D. that

included all areas of suspected disability, specifically, Autism Spectrum Disorder (ASD), from mid-

February 2008 until February 23, 2009 (Pl. Compl. Ex. A, ALJ Decision & Or. at 40, ¶ 1).  The ALJ

ordered the District to reimburse Plaintiff $510.00 for her out-of-pocket expenses incurred in

obtaining therapy for L.G.D. during that time period (*id.* at 41, ¶ 1).

With regard to the remaining claims, the ALJ concluded that the District had offered L.G.D.

an educational program that was reasonably calculated to provide him a FAPE, thus ruling in favor

of the District, concluding:

[2]Unless otherwise noted, the party references and docket number citations in this Opinion refer to the lead case, no. 1:10-cv-1170, the docket of which provides cross-references for documents also filed in the member case, no. 1:10-cv-1176.  For ease of reference, this Opinion simply refers to the parties in the lead case.

[3]Nineteen witnesses testified at the hearing; the administrative record includes 1,649 pages of transcript and 96 exhibits.

[4]The ALJ is also identified in the record as the independent hearing officer (IHO), which is a reference to the term used in the IDEA.  This Opinion will simply refer to the ALJ.

(1) the predetermination of L.G.D.'s eligibility classification in February 2009 was a minor procedural violation;

(2) L.G.D.'s February 23, 2009, September 29, 2009 and February 18, 2010 individualized educational programs (IEPs) were procedurally sufficient and reasonably calculated to provide L.G.D. with a meaningful educational benefit gauged in relation to his potential, and the educational placement and services appeared appropriate for L.G.D. considering the nature and severity of his disability and his then-present level of academic achievement and functional performance; and

(3) with the exception of the failure to evaluate all areas of suspected disability from February 2008 to February 2009, and the predetermination of L.G.D.'s eligibility classification in February 2009, it generally appeared from the record that the District acted in conformity with its obligations to L.G.D. and his parents under the IDEA.

(ALJ Decision & Or. at 40-41, ¶¶ 2-4).

The parties filed separate cases in federal district court, each appealing the administrative decision. On November 24, 2010, Plaintiff Julie Shafer, L.G.D.'s mother, filed case no. 1:10-cv-1170 against Defendant Whitehall District Schools and Board of Education, seeking (1) a declaratory judgment that she was the prevailing party in the underlying IDEA administrative action, and thus entitled to fees, costs, and interest (Count 1); (2) review of the ALJ's Decision and Order (Counts 2-4); and (3) additional relief for violations of the Michigan Mandatory Special Education Act (MMSEA), MICH. COMP. LAWS § 380.1701 *et seq.* (Count 5) and § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 (Count 6).

On November 29, 2010, Whitehall District Schools filed case no. 1:10-cv-1176, against Defendant J.S., on behalf of her son. The District appeals the A.L.J.'s decision ordering reimbursement of $510.00 to Plaintiff for out-of-pocket therapy.

In April 2011, Plaintiff filed a motion to supplement the administrative record with an additional 64 pages of evidence, including the IEPs and academic progress reports for L.G.D. for the 2010–2011 school year, as well as supporting and other documents, such as a STAR Reading Diagnostic Report dated 9/5/10, Annual Goals and Short-term Objectives update from 11/30/10, and third grade report cards. Defendant filed a motion to conditionally admit rebuttal evidence. Following a hearing, the Magistrate Judge granted Plaintiff's motion and denied without prejudice Defendant's motion. The District objected to the Magistrate Judge's Order; this Court denied the Objections in a September 11, 2011 opinion and order (Dkt 34). These cases are now before the Court on the administrative record, as supplemented.

Following a pre-motion conference, the parties fully briefed the motion for summary judgment. However, this initial briefing was stricken by the Court after Plaintiff moved to revise her original motion brief based on Defendant's response brief (Dkts 43, 49). On January 30, 2012, the Court granted Plaintiff's Motion to Submit a Revised Brief, and ordered Plaintiff to review the factual and legal basis of her claims under the MMSEA and § 504 of the Rehabilitation Act (Counts 5 and 6 of her complaint, case no. 1:10-cv-1170) to determine whether these claims are proper and viable (Dkt 49). The Court also ordered Plaintiff to pay reasonable attorney fees and costs incurred by Defendants in the preparation and filing of a brief in response to Plaintiff's revised motion and brief (*id.*).

## II. FACTS

L.G.D. was born April 20, 2002 and at the time of this motion, was nine years old (SMF[5] ¶ 1). He and his parents, who are divorced, reside in the Whitehall Public School District, where L.G.D. has always attended school (*id.*). L.G.D. was initially evaluated for special education services in December 2003 at the age of nineteen months (*id.*). The North Service Unit (NSU) evaluator recommended Early On home-based services to address language delays and sensory issues (*id.* ¶ 2). In April 2004, L.G.D. was found eligible for special education services as a student with a speech and language impairment (SLI) and was enrolled in an Early Childhood Special Education (ECSE) classroom (*id.* ¶ 3).

In an Occupational Therapy (OT) evaluation review completed in January 2005, school staff recommended OT "to continue working on regulating sensory input in the therapy setting and in the ECSE classroom, in order to increase functional preschool skills …" (SMF ¶ 5). That evaluation noted disrupted sleep patterns, concerns in all areas of sensory processing, and hand tremors the majority of the time during fine motor tasks, which seemed "more noticeable with high concentration, when hungry, or after a nap" (*id.*).

According to his February 2005 IEP, L.G.D. was to receive both speech-language therapy (SLT) and OT for 80-120 minutes per month (SMF ¶ 6). The team noted that L.G.D. "exhibits concerns in all areas of sensory processing which affects his ability to learn new tasks and function

---

[5]Plaintiff has filed a Statement of Material Facts (SMF) (Pl. Br. Ex. A, Dkt 63-1), and Defendants have filed a response in corresponding numbered paragraphs (Defs. Br. Ex. A, Dkt 65-1). Unless otherwise noted, a citation to the SMF relies on both parties' Statements (except for record citations, quotations and emphases are omitted for quoted facts from the SMF).

in social settings" (*id.*). The IEP also noted that "Sensory-motor diet/therapy is needed as a strategy to use within his school day" (*id.*).

In an evaluation completed at DeVos Children's Hospital ("DeVos") in October 2005, psychologist Steven L. Pastyrnak, Ph.D., identified "an anxiety-based hyperarousal that ... although not always overt, can contribute to challenges within L.G.D.'s sensory processing, socialization …" (SMF ¶ 8; Ex. 7 at 3). A January 2006 speech language evaluation found that lack of verb agreement and topic maintenance were impeding effective communication, as were sound substitutions, a rapid rate of speech, phrase repetition, and speech bursts. The speech-language therapist recommended continued SLT "focusing on expressive language clarity" (SMF ¶ 9). The January 2006 OT evaluation recommended continued therapy "to improve motor skill coordination and control, balance, writing skills, and to reinforce behavioral goals using sensory strategies" (*id.* ¶ 10). The evaluators recommended continued SLI eligibility and an additional eligibility of other health impaired (OHI) (*id.* ¶ 12).

L.G.D.'s IEP of January 2006 identified his eligibility as SLI and OHI, continued the same level of speech and occupational therapy, and placed him in an ECSE classroom (SMF ¶ 13). The IEP team noted that L.G.D. "has difficulty interacting positively and successfully with his peers. He also has difficulty maintaining a topic during conversation" (*id.*). His goals included, maintaining a topic with peers and adults, speaking more slowly, and engaging in positive interactions with peers (*id.*). L.G.D.'s January 2007 IEP increased his speech therapy to 100 to 160 minutes per month, continued his occupational therapy at 80 to 120 minutes per month, and continued ECSE classroom placement (*id.* ¶ 14).

In May 2007, L.G.D. was again evaluated at DeVos, by psychologists Pastyrnak and Stephen J. Albrecht, Ph.D., and was given a provisional diagnosis of Autism Spectrum Disorder (ASD) "by virtue of the presence of qualitatively unusual impairments in social relatedness, play, shared attention, content of communication, and restricted repertoire of interests" (SMF ¶ 15; Ex. 18 at 7). The diagnosis was "provisional" because of his young age (SMF ¶ 15).

The District was provided with a copy of the DeVos report at L.G.D.'s IEP team meeting on May 30, 2007 ( SMF ¶ 16). The DeVos evaluators recommended that "regular education placement with accommodations for autism spectrum status should be discussed with school officials. Ancillary school-based services to consider include[d] school social work/counseling to address behavioral-emotional regulation and social relatedness problems, speech and language services to address pragmatics, and an Autism Impaired (AI) consultant to address any barriers that are preventing maximum achievement in the regular education classroom" (*id.*; Ex. 18 at 8-9).

In January 2008, Plaintiff requested an ASD evaluation (SMF ¶¶ 18-19). Anne Windberg, L.G.D.'s private therapist wrote a letter to the District, dated January 9, 2008, referencing the May 2007 DeVos evaluation and recommending an ASD evaluation (*id.* ¶ 18). By e-mail dated March 3, 2008, L.G.D.'s kindergarten teacher informed Plaintiff that District staff "didn't feel that there was a need for an ASD evaluation for L.G.D" (*id.* ¶ 20). The e-mail noted that the staff had discussed L.G.D.'s significant improvements in academic and social skills, and in light of all the growth and changes seen in him, the recommendation to assess him for ASD might not be valid if he were reevaluated (*id.*, Ex. 22).

L.G.D.'s May 2008 IEP does not reference the DeVos report, Plaintiff's request for an ASD evaluation, or L.G.D.'s sensory issues (SMF ¶ 21; Ex. 24). That IEP continued his eligibility as a

student with SLI and OHI and placed him in an elementary resource room for 8 to 10 hours per week. Speech therapy stayed the same at 60-120 minutes per month, social work services were increased to 30-60 minutes per month, and OT was increased to 120 to 240 minutes per month. The only supplementary aid listed is nursing services as needed for medications (*id.*).

In September 2008, Plaintiff again requested an evaluation to determine L.G.D.'s eligibility for services as a student with an ASD, as well as to look at the possibility that he was struggling with a specific learning disability (SLD) (SMF ¶ 23; Ex. 62). In October 2008, an autism consultation with a Muskegon Area Intermediate School District (MAISD) teacher consultant, Holly Wilson, was requested by District staff so that Wilson could be involved in the ASD evaluation requested by Plaintiff (*id.* ¶¶ 24-26; Exs. 25, 79). The student evaluation plan completed on January 16, 2009 noted that Plaintiff would like L.G.D. to be evaluated "for achievement and ASD" (*id.* ¶ 28; Ex. 26).

On January 27, 2009, the Multi-disciplinary Evaluation Team (MET) recommended continued SLI and OHI eligibility (SMF ¶ 29; Exs. 30, 31). The SLI MET Cover Sheet refers to the 1/27/09 Speech-Language Report containing detailed information about L.G.D.'s language and fluency issues (Defs. SMF ¶ 29). Further, the Occupational Therapy Progress Note dated "1-09" includes the results of a Sensory Profile that was done on L.G.D., and states that he scored in the typical or average range in all areas except one subtest, the area of sensitivity, and that his overall score is average showing no significant sensory issues (Defs. SMF ¶ 29; Ex. 27). The OT Progress Note Recommendations also state that "L.G.D. is functional in all aspects of his education setting"; he "no longer qualifies to receive direct OT services"; and "OT will be available on a consult basis if needed" (Ex. 27).

The MET OHI cover sheet notes that "L.G.D. has difficulty sitting still during one on one or small group instruction such as speech therapy …. L.G.D. has a rapid rate of speech which makes it difficult at times for staff and peers to understand what he is saying the first time he says it. … L.G.D. met his social goals from the previous IEP …. L.G.D. continues to work on inviting peers to play especially during indoor recess and refraining from interrupting when others are talking. L.G.D.'s inconsistencies in academics, rapid rate of speech, and difficulty focusing at times makes it difficult for him to be successful in the general education curriculum without special education support" (SMF ¶ 30; Ex. 31).

In a January 2009 OT progress note on L.G.D. completed when L.G.D. was six-and-a-half-years old by Paula Martin, the OT assigned to L.G.D. after he began kindergarten, reflects growth from May 2008 to January 2009 in five of seven areas assessed (SMF ¶ 47): With regard to Gross Motor Skills, bilateral coordination increased 12 months; in the area of Fine Motor Skills, upperlimb coordination, fine motor precision, fine motor integration and manual dexterity all grew from at least 21 months to as much as 36 months; and L.G.D. was above the age equivalents in four of the seven areas. Although he did not show growth in the area of balance or in running speed and ability, those assessments showed him at age equivalents of 5 years, 11 months (down from 6 years 8 months in May 2008) and 5 years 9 months respectively (down from 6 years 5 months in May 2008)[6] (*id.*; Exs. 23, 27).

The January 27, 2009 IEP does not reference the DeVos report, Plaintiff's request for an ASD evaluation, or L.G.D.'s sensory issues (SMF ¶ 31; Ex. 32). That IEP continued his eligibility

_____

[6]Defendants admit that Martin miscalculated her comparison of the results of the "balance" and the "running speed" assessments and reported growth instead of the loss of skills which actually had occurred (Defs. SMF ¶ 47).

as a student with SLI and OHI and placed him in an elementary resource room for 8 to 12 hours per week. Speech therapy stayed the same, social work services were decreased to 20 to 40 minutes per month, and OT was discontinued pursuant to the 1-09 Occupational Therapy Progress Note Recommendations (Defs. SMF ¶ 31; Ex. 27).

The social worker and ASD consultant completed the Autism Diagnostic Observation Schedule (ADOS) (SMF ¶ 36; Ex. 36 at 6). In the February 20, 2009 Report, they indicated that "L.G.D.'s scores of the ADOS in social and communication fell in the autism spectrum range. However, he did not show evidence of restricted, repetitive behaviors on the ADOS" (*id.*; Ex. 36 at 7). The MET concluded that L.G.D. did not meet the criteria for an ASD (*id.*; Ex. 36 at 8, Ex. 40).

The February 23, 2009 IEP added SLD eligibility in the areas of basic reading, math calculation, math reasoning, and written expression (SMF ¶ 38; Ex. 41). L.G.D.'s pragmatic language and social skill issues were referenced briefly in the present level section (SMF ¶ 38; Ex. 41 at 4). All supplemental aids, goals and objectives, and related services were the same as those recommended in the January 2009 IEP (Ex. 41 at 5-9). Plaintiff disagreed with the IEP but allowed it to be implemented; however, L.G.D.'s father agreed to the IEP as written (SMF ¶ 38; Ex. 41 at 13-14).

Plaintiff also requested an independent educational evaluation (IEE), which was completed at public expense, dated July 9, 2009, and provided to the District (SMF ¶ 39). In that report, Dr. Albrecht, who previously evaluated L.G.D. at DeVos, clinically diagnosed L.G.D. with Asperger's Syndrome, an autism spectrum disorder, "by virtue of the presence of qualitatively unusual impairments in social relatedness, play, shared attention, content of communication, and restricted repertoire of interests" (*id.* ¶ 40; Ex. 44 at 7). Dr. Albrecht concluded that L.G.D. "clearly

demonstrates sufficient symptoms at this time for an official diagnosis of Asperger's disorder," and that his history is consistent with symptoms of Autism Spectrum Disorder (ASD) specifically Asperger's disorder …." Dr. Albrecht's report stated that "[f]indings from this evaluation suggest that L.G.D. will have increased difficulties with decisions based on social judgements" (SMF ¶ 53; Ex. 44 at 7). In the report, numerous specific recommendations were made for the District to consider (Ex. 44 at 8-9).

L.G.D.'s IEP of September 29, 2009 continued SLD, SLI and OHI eligibility (SMF ¶ 41). A number of supplemental aids, services and personnel support were added, including among these, picture schedules, support from an autism consultant, and advance notice of schedule changes (*id.*; Ex. 45). The IEP continued speech and language service at 60-120 minutes per month and social work services at 20-40 minutes per month (*id.*).

On November 9, 2009, Plaintiff submitted a due process complaint and asked for a hearing and mediation (SMF ¶ 66). The mediation concluded with a mediated IEP team meeting on February 18, 2010 (*id.*; Ex. 52). That IEP added or continued eleven separate supplementary aids and services and tripled L.G.D.'s school social work services from the prior IEP (Defs. SMF ¶ 66; Exs. 45, 52).

### III.  LEGAL STANDARD

The IDEA, 20 U.S.C. §§ 1400 *et. seq.*, entitles eligible children with disabilities to a FAPE, which includes the development and implementation of an IEP addressing each disabled child's particular needs. *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 181 (1982); *Woods v. Northport Pub. Sch.,* 487 F. App'x 968, 970 (6th Cir. 2012). The IDEA provides a hearing process for parents who disagree with their child's IEP, and any party aggrieved by the

final decision in such hearing may appeal to a court of competent jurisdiction. *Woods*, 487 F. App'x at 970 (citing MICH. ADMIN. CODE R. 340.1724f(7)).

The IDEA mandates that in reviewing a final administrative decision, a district court "(*i*) shall receive the records of the administrative proceedings; (*ii*) shall hear additional evidence at the request of a party; and (*iii*) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C). "In so doing, the district court 'should make an independent decision based on the preponderance of the evidence but also should give 'due weight' to the determinations made during the state administrative process.'" *Woods*, 487 F. App'x at 973 (quoting *Deal v. Hamilton Cnty. Bd. of Educ.,* 392 F.3d 840, 849 (6th Cir. 2004) (citing *Rowley*, 458 U.S. at 206)). As the Sixth Circuit explained, under this "modified de novo" standard of review:

> district courts may not "simply adopt the state administrative findings without an independent re-examination of the evidence," nor may they "substitute their own notions of sound educational policy for those of the school authorities which they review." The amount of "due weight" afforded to the administrative findings varies depending on whether such findings are based on educational expertise. "Less weight is due to an agency's determinations on matters for which educational expertise is not relevant .... More weight is due to an agency's determinations on matters for which educational expertise is relevant." Stated succinctly, a district court "may set aside administrative findings in an IDEA case only if the evidence before the court is more likely than not to preclude the administrative decision from being justified based on the agency's presumed educational expertise, a fair estimate of the worth of the testimony, or both."

*Woods*, 487 F. App'x at 973 (citations and internal quotation marks omitted). "This modified *de novo* standard of review applies to both procedural and substantive matters." *McLaughlin v. Holt Pub. Schs.*, 320 F.3d 663, 669 (6th Cir. 2003). "Under a modified de novo standard of review, a district court is required to make findings of fact based on a preponderance of the evidence contained in the complete record, while giving some deference to the fact findings of the

administrative proceedings, particularly when educational expertise is essential to the findings."

*N.L. ex rel. Ms. C. v. Knox Cnty. Schs.,* 315 F.3d 688, 692 (6th Cir. 2003).

"The party challenging an IEP carries the burden of proving by a preponderance of the evidence that the IEP was inadequate." *Woods*, 487 F. App'x at 974 (citing *Deal*, 392 F.3d at 854); *see also Schaffer ex rel. Schaffer v. Weast,* 546 U.S. 49, 62 (2005). Likewise, with regard to procedural compliance, the burden of proof in an administrative hearing rests with the party seeking relief. *Dong v. Bd. of Educ. of Rochester Cmty. Schs.,* 197 F.3d 793, 799-800 (6th Cir. 1999).

Plaintiff moves for summary judgment, citing the summary judgment standards under Federal Rule Civil Procedure 56. Defendants argue that the parties agreed, and this Court ordered, that all issues would be decided "on the administrative record" (Dkt 65 at 13, citing Dkts 37, 40). Defendants contend that such an approach is consistent with the IDEA's modified *de novo* review standard, and precludes this Court's consideration of the additional evidence Plaintiff submitted (Dkt 65 at 13). Defendants correctly point out that the courts have distinguished between a judgment on the administrative record in IDEA cases and a decision considering additional evidence in which the summary judgment standard is applied. *See Doe ex rel. Doe v. Metro. Nashville Pub. Schs.*, 133 F.3d 384, 387 n.2 (6th Cir. 1998); *Elida Local Sch. Dist. Bd. of Educ. v. Erickson*, 252 F. Supp. 2d 476, 480-81 (N.D. Ohio 2003). In *Elida*, the court explained the distinction:

> "In a case involving a motion for summary judgment, the court should still apply modified de novo review, but must ensure that there are no genuine issues regarding the facts essential to the hearing officer's decision. In rendering its decision, the court may still rely upon the hearing officer's presumed educational expertise, as long as the material facts underlying the officer's determination are not in dispute."

*Elida Local Sch.,* 252 F. Supp. 2d at 481 (quoting *Burilovich v. Bd. of Educ. of Lincoln Consol. Schools,* 208 F.3d 560, 567 (6th Cir. 2000) (citations omitted)). Summary judgment also requires

that the facts be viewed in the light most favorable to the non-movant and that the movant be entitled to a judgment as a matter of law. *Nashville Pub. Schs.*, 133 F.3d at 387 n.2 (citing FED. R. CIV. P. 56(c)).

This Court need not resolve any dispute regarding the standard or the additional evidence because the Court reaches the same result regardless of any consideration of the additional evidence. For the reasons that follow, the Court concludes that Plaintiff's arguments are without merit, she is not entitled to the relief from the administrative decision, and she is not entitled to summary judgment even considering the additional evidence.

## IV. ANALYSIS

Plaintiff raises three issues on appeal, alleging both procedural and substantive violations of the IDEA. Plaintiff argues that the ALJ erred in finding: (1) procedural violations by the District in connection with conducting and completing L.G.D.'s ASD eligibility and IEP team meetings in February 2009 did not deny him a FAPE; (2) L.G.D.'s IEPs were reasonably calculated to provide him a meaningful educational benefit gauged in relation to his potential; and (3) significant violations of the IDEA and a denial of FAPE but failing to provide appropriate relief.

In *Rowley*, the United States Supreme Court defined a FAPE as "educational instruction specifically designed to meet the unique needs of the handicapped child." *Rowley,* 458 U.S. at 188-189. The Supreme Court developed a two-prong test to determine whether a school district has provided a FAPE:

> First, has the state complied with the procedures set forth in the Act? And, second, is the individualized education program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefit?

*Rowley*, 458 U.S. at 206-207 (footnotes omitted); *accord Berger v. Medina City Sch. Dist.*, 348 F.3d 513, 520 (6th Cir. 2003); *Dong*, 197 F.3d at 800. "If these requirements are met, the State has complied with the obligations imposed by Congress and the courts can require no more." *Rowley*, 458 U.S. at 207; *accord Kings Local Sch. Dist., Bd. of Educ. v. Zelazny*, 325 F.3d 724, 729 (6th Cir. 2003). "Specifically, this means '[t]he statute may not require public schools to maximize the potential of disabled students commensurate with the opportunities provided to other children.'" *Kings Local Sch. Dist.*, 325 F.3d at 729 (quoting *Renner v. Bd. of Educ. of Pub. Schs. of City of Ann Arbor,* 185 F.3d 635, 644 (6th Cir. 1999)).

## A. Procedural Violation

Plaintiff argues that the ALJ erroneously concluded that the predetermination in February 2009—that L.G.D. was not eligible under the ASD eligibility category, did not have the effect of depriving the student of educational benefits. Plaintiff argues to the contrary that the predetermination was a fatal procedural error that denied her the right to effectively participate and denied L.G.D. a FAPE. Plaintiff asserts that "[t]he delay and the predetermination to deny a certain category of eligibility and not to provide certain services resulted in the loss of educational opportunity for L.G.D., seriously infringed on his parent's opportunity to participate in the IEP formulation process, and caused a deprivation of educational benefits" (Pl. Br., Dkt 63 at 9). The Court disagrees. Plaintiff's assertions are not supported by the record.[7]

---

[7]As a general matter with regard to this Opinion, the Court notes that Plaintiff's counsel misstates and selectively references the record to suit her purposes. This tactic unnecessarily consumes extraordinary resources of the Court in combing the administrative record. It also invites the danger of flawed reasoning and an unjust outcome by misleading the Court. This conduct appears to be a pattern with Plaintiff's counsel, who has previously and similarly been chastised by the federal district court for habitual mischaracterization of the record in her briefs and for ignoring substantial evidence when it does not support her arguments. *See, e.g., Masar v. Fruitport Cmty.*

As to the first prong of the *Rowley* standard, the Sixth Circuit has held that a strict review

of an IEP for procedural compliance is required but that technical deviations do not render an IEP

invalid. *Dong*, 197 F.3d at 800. The procedural inquiry should focus on whether there has been

"full participation" of the parties throughout the IEP development process. *Rowley*, 458 U.S. at 206;

*see also Knable ex rel. Knable v. Bexley City Sch. Dist.*, 238 F.3d 755, 765 (6th Cir. 2001).

The ALJ recognized that predetermination is a procedural violation, and that when an IEP

is predetermined, it will almost always impede the student's right to a FAPE, as well as very

frequently significantly impede the parents' opportunity to participate in the decision-making

process, and thus must be a denial of a FAPE (ALJ Decision & Or. at 33). However, the ALJ

distinguished between the predetermination of an IEP, which almost always results in the denial of

a FAPE, and the predetermination of merely the student's eligibility classification. In this case, the

ALJ found that it was the latter that was predetermined—the District's IEP Team members

predetermined that L.G.D. was not subject to classification under the ASD eligibility category.

Nonetheless, the ALJ concluded that because L.G.D. was found eligible for special education and

related services under other eligible categories, the predetermination of ineligibility under the ASD

category did not have the effect of depriving him of educational benefits (*id.* at 33-34).

"[A] procedural violation of the IDEA is not a *per se* denial of a FAPE; rather, a school

district's failure to comply with the procedural requirements of the Act will constitute a denial of

a FAPE only if such violation causes substantive harm to the child or his parents." *Knable,* 238 F.3d

at 765. "Substantive harm occurs when the procedural violations in question seriously infringe upon

the parents' opportunity to participate in the IEP process. In addition, procedural violations that

---

*Schs. Bd. of Ed.,* Case No. 1:01-cv-794, slip op., Dkt 53 at 31-32 (W.D. Mich. Aug. 18, 2003).

deprive an eligible student of an individualized education program or result in the loss of educational opportunity also will constitute a denial of a FAPE under the IDEA." *Id.* at 765-66 (citations omitted); *see* 20 U.S.C. § 1415(f)(3)(E)(*ii*).

Plaintiff acknowledges that "some" courts have held that a procedural violation of the IDEA must cause substantive harm to the child or his parents to warrant relief (Pl. Br. at 9, also citing *Knable*). She thus contends that she "has provided significant evidence and argument related to LGD's specific sensory, social skill, emotional/behavioral, and communication needs that have negatively impacted, and continue to impact, his educational performance" (Pl. Reply, Dkt 64 at 2).

The only evidence Plaintiff cites in support of her argument are the general statements that: (1) "Witnesses testified that L.G.D. needed sensory integration therapy, social skill instruction, and pragmatic language instruction in order to learn"; and (2) "Numerous district and private service providers testified that such services were needed and must be provided consistently in all settings, including the school setting, in order to be effective" (Pl. Br. at 9, citing Tr. I at 54-55, 90-91, 120-21; Tr. VI at 1197-98).

Plaintiff's assertions are belied by the record. Plaintiff's citations to the record reference the testimony of three witnesses: Tammi Ryan, an occupational therapist (OT) at Generation Care, who first had contact with L.G.D. in October 2009; Monica Herman, L.G.D.'s pre-school (NSU) OT; and Holly Wilson, the MAISD autism-ASD teacher consultant. Ryan testified that L.G.D., like some children, would make progress in certain areas but then lose some of those skills after working on a different area (Tr. I at 54). In response to counsel's question as to "[w]hat kinds of things can you do to solidify and then maybe help generalize those skills?," Ryan stated that she thought "increased consistency"—"working on them more consistently in all settings …" (Tr. I at 54-55). Ryan

testified in general that to be most effective, therapy should take place in all environments (Tr. I at 90). However, Ryan also testified in this regard that the District had implemented certain sensory integration strategies with L.G.D.:

> Q.     Did you get the sense that at some point someone had worked on sensory integration items at school or sensory integration dysfunction at school?
>
> A.     You know, like I said earlier, those recommendations of the wiggle seat and the lap pad, those are general strategies that are used within sensory integrations. I wouldn't necessarily call those sensory integration treatment, but they're strategies that can be used that follow the sensory integration theory. And those had been implemented, from what I understand.

(Tr. I at 53).

Plaintiff also cites testimony of Monica Herman, who worked with L.G.D. once a week until he entered kindergarten in September 2006, stating that she would have recommended that follow-up sensory integration therapy continue (Tr. I at 120-21). However, she further testified that L.G.D. did receive therapy services after ECSE and he was transitioned to Paula Martin's caseload (Tr. I at 121). Holly Wilson testified that in general children with autism require social skills training and that because of generalization difficulties such children have, it is important to teach these skills at school, at home and in the community because you want the skill to be generalized in all settings (Tr. VI at 1197-98). Despite the cited testimony, there was by far more testimony and evidence that L.G.D. received appropriate services based on his evaluations, staff observations, and his needs,[8] undermining Plaintiff's general assertions concerning the cited witness testimony.

---

[8]Plaintiff cites eight pages of testimony in more than 1600 pages of transcript.

But even if Plaintiff's assertions were supported by the record, she has not established, and the Court does not find, that the ALJ erred in concluding that the predetermination did not have the effect of denying L.G.D. educational benefits. It is undisputed that in February 2009, L.G.D. was evaluated in four areas of suspected disability, including "Speech and Language Impairment" (SLI), "Other Health Impairment" (OHI), "Specific Learning Disability" (SLD) and "Autism Spectrum Disorder" (ASD); he was determined eligible for services in three of the four areas, SLI, OHI, SLD (*see* Decision & Or., Findings of Fact ¶ 35). The ALJ found that the IEP Team decided that while L.G.D. would continue to be eligible for special education and related services under the SLI and OHI eligibility classifications, these were now both listed as secondary disabilities and he was found to be primarily eligible under the new SLD classification (*id.* ¶ 42; *see* Ex. 41).

As the ALJ observed, "[t]he IDEA concerns itself not with labels, but with whether a student is receiving a free and appropriate education." *Heather S. v. State of Wis.*, 125 F.3d 1045, 1055 (7th Cir. 1997) (*see* Decision & Or. at 34). Here, despite the predetermination that L.G.D. was not ASD eligible, the IEP Team met with the parents, and in consultation with the service providers and the parents, an IEP was developed to meet L.G.D.'s unique needs. Also despite the predetermination that L.G.D. was not ASD eligible, his IEP was developed based on a thorough consideration of the required FAPE factors, and Plaintiff participated in the February 2009 IEP Team meeting and provided her input (Ex. 41). Even though Plaintiff disagreed with the IEP, L.G.D.'s father agreed with the IEP and its implementation (*id.* at 13). Based on a preponderance of evidence in the record, the procedural violation committed by Defendants with regard to the predetermination did not result in the denial of a FAPE. *See Knable,* 238 F.3d at 765.

The Court rejects Plaintiff reliance on *Deal*, 392 F.3d at 855-59, to assert that the predetermination in this case necessarily results in a substantive violation depriving L.G.D. of a FAPE (Pl. Br., Dkt 63 at 8). In *Deal*, the finding of the denial of a FAPE was based on the school district's outright preclusion of certain services regardless of the benefits, based on unofficial school policy:

> The facts of this case strongly suggest that the School System had an unofficial policy of refusing to provide one-on-one ABA programs and that School System personnel thus did not have open minds and were not willing to consider the provision of such a program. This conclusion is bolstered by evidence that the School System steadfastly refused even to discuss the possibility of providing an ABA program, even in the face of impressive results. . . . The clear implication is that no matter how strong the evidence presented by the Deals, the School System still would have refused to provide the services. This is predetermination.

*Deal*, 392 F.3d at 858. In this case, unlike in *Deal*, the predetermination was not based on a *per se* preclusion of services, and no *per se* substantive harm occurred as a result of Defendants' failure to classify L.G.D. as ASD eligible. *See Seladoki v. Bellaire Local Sch. Dist. Bd. of Educ.,* No. C2–07–1272, 2009 WL 3127775, at *12 (S.D. Ohio Sept. 28, 2009) (distinguishing the predetermination in *Deal*).

### B. IEPs

The second prong of *Rowley* focuses on whether the student's IEP is reasonably calculated to enable the student to receive educational benefit. The IDEA requires that school districts provide eligible students a "'basic floor of opportunity'"; the statute does not require that a school either maximize a student's potential or provide the best possible education at public expense. *Rowley,* 458 U.S. at 198, 200-01; *see also Renner,* 185 F.3d at 644. An IEP satisfies the second *Rowley* prong if it was formulated to provide the student a "meaningful educational benefit" gauged in relation to the student's potential. *Deal*, 392 F.3d at 862; *see also Rowley,* 458 U.S. at 192. "Only

by considering an individual child's capabilities and potentialities may a court determine whether an educational benefit provided to that child allows for meaningful advancement." *Deal*, 392 F.3d at 864.

Plaintiff argues that the ALJ erred in finding that L.G.D.'s IEPs were reasonably calculated to provide him a meaningful educational benefit gauged in relation to his potential. She first contends that the ALJ failed to apply the appropriate standard to determine if a FAPE was provided. She also argues that in refusing to acknowledge or address L.G.D.'s educational needs stemming from his ASD, Defendants denied L.G.D. a FAPE in that (1) appropriate OT Services were not provided after June 2007 and were discontinued entirely in January 2009; (2) L.G.D. has not received appropriate and needed speech language therapy services to address pragmatic language and social communication impairments; and (3) L.G.D. has not received appropriate and needed social skill instruction and support.

Plaintiff's claims are not supported by the record. As noted above, Plaintiff selects excerpts of testimony or portions of the record to purportedly support her assertions and legal arguments, while ignoring extensive evidence to the contrary. Having reviewed Plaintiff's claims in light of the complete record, the Court concludes that the ALJ's decision must be upheld. "[A] district court 'may set aside administrative findings in an IDEA case only if the evidence before the court is more likely than not to preclude the administrative decision from being justified based on the agency's presumed educational expertise, a fair estimate of the worth of the testimony, or both.'" *Woods*, 487 F. App'x at 973 (citations omitted).

### 1. Appropriate Standard

Plaintiff contends the ALJ used the wrong standard in deciding whether L.G.D. received a FAPE by failing to apply the higher Michigan standard under the MMSEA. Plaintiff's cursory argument on this point provides no persuasive authority for finding error. As discussed subsequently, Plaintiff has failed to assert any claim under the MMSEA in this appeal (Pl. Br., Dkt 63 at 4). The IDEA does not require the district to maximize a student's potential. *Rowley*, 458 U.S. at 198, 200-01. Thus, the higher Michigan standard is immaterial to Plaintiff's instant IDEA appeal.

### 2. OT Services

Plaintiff asserts that appropriate OT Services were not provided after June 2007 and were discontinued entirely in January 2009. She argues that L.G.D.'s OT services "were discontinued improperly" and "the decision was based on an obvious lack of knowledge or understanding of sensory integration dysfunction by the elementary OT, Paula Martin" (Pl. Br., Dkt 63 at 15). As discussed subsequently, the record does not support Plaintiff's contentions (*see also* Def. Ex., Dkt 66, Att. F, Chart Summarizing Testimony Regarding Sensory Integration Therapy).

OT is a related service. 34 C.F.R. § 300.34(c)(6). A student is entitled to related services as required "to assist the child with a disability to benefit from special education." 34 C.F.R. § 300.34(a). While Monica Herman, L.G.D.'s preschool occupational therapist, and Tammi Ryan, his current private OT, testified about their opinions of L.G.D.'s need for OT, their testimony was not conclusive, and did not take into account L.G.D.'s specific needs in the school setting and staff assessments as he matured, and the staff testimony and opinions were to the contrary. Plaintiff's cursory citations to the record do not support her broad conclusions of error in the ALJ's findings and conclusions.

L.G.D. received OT services in the Early On and ECSE programs. Plaintiff cites testimony of Monica Herman that she would have been surprised if L.G.D. did not receive any more sensory integration services after he left her caseload since that would not have been her recommendation (Pl. Br., Dkt 63 at 16-17). Plaintiff further states that Paula Martin, the District's OT assigned to L.G.D. after he began kindergarten, "admitted she did not provide L.G.D. with any sensory integration services, other than consultation with teachers about environmental modifications and some sensory devices" (*id.* at 17). However, Martin determined from the school-based evaluations that L.G.D. did not have deficits that required school-based OT. Martin testified in this regard that they "never really had any huge sensory needs," and '[t]here were never really any huge sensory concerns in the classroom," so the main focuses for therapy for L.G.D. were fine motor and gross motor skills, and bilateral coordination (Tr. I, 133-34). She stated that in the morning, L.G.D. seems to be much calmer (*id.* at 133). She had L.G.D. on her caseload from September 2006 to January 2009 and he was seen twice a week, once by Martin and once by a certified OT assistant (*id.* at 135). In January 2009, she discontinued OT services for him, but she did reevaluate L.G.D.'s case in January 2010 (*id.*; Ex. 49).

When asked about her observations of L.G.D.'s sensitivity to sensory motor issues, Martin testified that she looked for these issues because she knew L.G.D. had had them in the past, but she never really noticed any (Tr. I at 154). She provided specific observations of L.G.D. in line with other students, in the "horrendously loud" cafeteria, on the playground and in physical education, and she observed that L.G.D. did quite well and did not exhibit any issues (*id.*). Martin further testified that a lot of the classrooms were already geared to reduce sensory issues, because the rooms were kept quieter, they used "cozy flags" to decrease the glare from lights, and a lot of the teachers

already use sensory strategies (*id.*). Martin's determinations were appropriately based on her evaluations of L.G.D.

Plaintiff also cites as supporting evidence that Martin did not test L.G.D. for visual perception issues because she had no concerns with those, but that her May 2008 evaluation's treatment focus for L.G.D. was "[t]herapy centered on improving fine, gross, and visual perceptual motor skills" (Pl. Br., Dkt 63 at 17-18). Plaintiff's criticism appears to be based on an incomplete or inaccurate representation of the record because Martin testified that visual motor skills are distinguished from visual perception skills (Tr. I at 138-39).

As Defendants point out, Martin's observations were confirmed by her formal assessments of L.G.D. Martin's OT progress note dated 1-09 includes the results of a Sensory Profile that was done on L.G.D., and states that he scored in the typical or average range in all areas except one subtest, the area of sensitivity,[9] and that his overall score is average showing no significant sensory issues (Defs. SMF ¶ 29; Ex. 27). The OT Progress Note Recommendations state:

> L.G.D. has made great improvements over the past year. His fine motor skills are at or above age level. L.G.D.'s gross motor skills are slightly below age level but fall in the average range. L.G.D. is functional in all aspects of his educational setting. L.G.D. no longer qualifies to receive direct OT services. OT will be available on a consult basis if needed.

(Ex. 27 at 2).

Numerous examples in the record support the basis for Martin's determinations (*see*, *e.g.*, Def. Br., Dkt 65 at 22). Martin's experience and credentials do not call into question her qualifications in this regard. She has 32 years' experience as an OT (over two decades longer than Ryan) (Tr. I at 26,

---

[9]The evaluation explains: "This means that L.G.D. detects sensory impute [sic?] in the classroom at a somewhat lower rate than his peers. This is consistent with [an] ADHD diagnosis" (Ex. 27 at 2).

129).  Martin has also had specific training on sensory integration, including techniques and testing (*id.* at 130).

Plaintiff's reliance on Ryan's testimony is also suspect and not representative of the complete record.  As Defendants point out (Defs. Br., Dkt 65 at 21), "Ryan observed [L.G.D.] in school on only one occasion, for approximately 40 to 50 minutes" (Tr. I at 46-47); "Ryan readily admitted that she could not comment about how [L.G.D.] generally acts at school" (*id.* at 37); and "[s]he also testified that she had no reason to dispute the observations of school staff" (*id.* at 79-80).  "In fact, Ryan explained that [L.G.D.] may actually do better in school than he does in therapy because school is more 'structured'" (*id.* at 85).

Further, Martin addressed the discrepancy between her findings in the educational setting and Ryan's clinical setting since he was older and "integrated" in that children's neural systems become accustomed to different environments (Tr. I at 155).  She explained that L.G.D.'s traits and needs would normally change as he matures:  "[A]s students grow and just part of maturation, their neurological systems mature" (*id.*).

Plaintiff also cites as supporting evidence of the detrimental effects of the lack of sensory integration, the fact that Martin's January 2009 OT progress report was based on miscalculations in comparing L.G.D.'s progress and that he actually declined in balance and running speed ability (Pl. Br., Dkt 63 at 18).  Here again, the complete record belies Plaintiff's overall arguments. Martin's January 2009 OT progress note on L.G.D. was completed when L.G.D. was six-years, nine-months old and reflects growth from May 2008 to January 2009 in five of seven areas assessed (Defs. SMF ¶ 47; Ex. 27):  With regard to Gross Motor Skills, bilateral coordination increased 12 months, and in Fine Motor Skills, upperlimb coordination, fine motor precision, fine motor

integration and manual dexterity all grew from at least 21 months to as much as 36 months, and

L.G.D. was above the age equivalents in four of the seven areas (Ex. 27). Although he did not show

growth in the area of balance or in running speed and agility, those assessments showed him at age

equivalents of 5 years, 11 months (down from 6 years 8 months in May 2008) and 5 years 9 months

respectively (down from 6 years 5 months in May 2008)[10] (*id.*; Exs. 23, 27).

Plaintiff's OT arguments are based on incomplete or misleading representations of the

record. Moreover, the determinations made with respect to sensory integration therapy fall within

the realm of educational expertise and educational methodology, requiring deference to the ALJ.

*See Woods*, 487 F. App'x at 974, 979. "'Less weight is due to an agency's determinations on

matters for which educational expertise is not relevant .... More weight is due to an agency's

determinations on matters for which educational expertise is relevant.'" *Id.* at 973 (quoting

*McLaughlin*, 320 F.3d at 673). Further, courts reviewing administrative actions under the IDEA

should avoid "substituting 'their own notions of sound educational policy for those of the school

authorities which they review ….'" *Nashville Pub. Schs.*, 133 F.3d at 386 (quoting *Rowley*, 458 U.S.

at 206). L.G.D. was not denied a FAPE because OT services provided after June 2007 were

inappropriate or because OT services were discontinued in January 2009.

### 3. Denial of Other Services

Plaintiff argues that L.G.D. has not received appropriate and needed speech language therapy

services to address pragmatic language and social communication impairments. She also contends

that L.G.D. has not received appropriate and needed social skill instruction and support. Having

---

[10]Defendants admit that Martin miscalculated her comparison of the results of the "balance" and the "running speed" assessments and reported growth instead of the loss of skills which actually had occurred (Defs. SMF ¶ 47).

reviewed Plaintiff's cited evidence in light of the complete record, the Court finds no basis for concluding that the IEPs failed to appropriately address L.G.D.'s overall needs.

Plaintiff relies on isolated testimony and evidence over several years to argue that L.G.D. "has not made the progress claimed by Shoreline Elementary staff; that he continues to struggle socially, behaviorally, and academically; and that he continues to be severely impacted by fine motor, sensory integration, speech and language and communication delays and impairments …" (Pl. Br., Dkt 63 at 23). As Defendants point out, the record is replete with testimony and evidence to the contrary (Def. Br., Dkt 65 at 20-21 & Att. E, Chart Summary of Social Skills Training Testimony). As discussed below, the Court concurs with Defendants, and the complete record supports, that L.G.D. did not require additional social skills or pragmatic language instruction to benefit from his education.

In support of her claims, Plaintiff cites isolated speech-language recommendations for L.G.D. from district staff in 2006 and 2009, such as recommendations for continued speech language therapy to address clarity and social communication (Pl. Br, Dkt 63 at 19-20; reciting Pl. SMF ¶¶ 50-51). However, Defendants accurately point out that L.G.D.'s IEPs from 2006 through 2009 consistently addressed his expressive language deficits, including topic maintenance and fluency (*see e.g.*, Ex. 15 at 3, Ex. 17 at 3-4; Ex. 19 at 3, Ex. 24 at 6, Ex. 32 at 5). For example, the 1/30/06 IEP has annual goals and short term objectives for maintaining a topic with peers and adults and for L.G.D. to demonstrate the use of fluent speech using a slow to moderate rate (Ex. 15 at 3). Similar objectives are set forth in his 1/29/07, 5/30/07 and 5/22/08 IEPs (Exs. 17, 19, 24). His 1/27/09 IEP continues with goals and objectives for language, listening and communication skills (Ex. 32).

Plaintiff also cites isolated testimony and evidence of L.G.D.'s social skills deficits, but she fails to provide any reasoned analysis or conclusion that his IEPs failed to address these areas (Pl. Br., Dkt 63 at 20-24). Plaintiff acknowledges that district staff testimony contradicts her contentions, but she asserts generally that the reliability and veracity of this testimony is questionable. Plaintiff's assertions are based on single episodes over several years, such as one bus conduct report on May 1, 2008 when L.G.D. was in kindergarten (Ex. 96; Tr. VII at 1556) or one noted observation by the school psychologist, Cara Thayler, of poor eye contact—L.G.D. not looking at the teacher when the teacher talks, one time in gym class in the fall of 2008 (Ex. 84). Plaintiff's assertions ignore the complete record and, particularly, contrary evidence in different or later time periods. For instance, Plaintiff cites the testimony of Jason Bogue, L.G.D.'s physical education teacher, that he did not make any adaptations in the gym class for L.G.D. because Bogue did not see any social skill or sensory needs, L.G.D. is a "typical" kid, and Bogue never noticed a problem with the rate of L.G.D.'s speech (Pl. Br., Dkt. 63 at 20). This testimony focused on L.G.D.'s current circumstances at the end of his second grade year (Tr. IV at 810-13). Bogue testified that L.G.D.'s interactions with other students is "fairly typical of any second grade student" (Tr. IV 811). Bogue's testimony is not undermined by the one bus conduct report when L.G.D. was in kindergarten.

Plaintiff cites to evidence that L.G.D. had problems with eye contact, but she concedes that improving eye contact was listed as an objective for L.G.D. on his last four IEPs (Pl. Br., Dkt 63 at 21-22). Plaintiff emphasizes that Cara Thayler acknowledged in her testimony that L.G.D. had difficulty on occasion making eye contact; however, Thayler testified that L.G.D. usually made appropriate eye contact (*id.*; Tr. IV at 848, 860).

Similarly, Plaintiff asserts that Melissa Throne, L.G.D.'s second grade teacher testified "she had not consulted with the ASD teacher consultant [Holly Wilson] **at all** for L.G.D." (Pl. Br. at 22, citing Tr. V at 1118-19; emphasis in original), but Throne in fact stated that Wilson had come into Throne's classroom to observe, and had offered some suggestions (Tr. V at 1118-19). Throne merely stated that she had not sought Wilson's assistance for L.G.D. (*id.* at 1119). Throne evaluated L.G.D. as meeting all expectations in social skills on his second grade report case and further explained her assessment of his social skills:

> He has such a good attitude. He comes in and gets started working. When I ask the kids to come up on the rug he comes up on the rug. He follows directions, participates willingly; that goes along with asking a buddy to set up the calendar with him to just automatically doing things on his own. Getting work done on time, sometimes he needs extra time or he needs extra help with that and, you know, that's totally expected. He does get along well. He does listen. He does know that his friends are trying to learn and doesn't bother them. He does a good job.

(Ex. 87, Tr. V at 1108).

Despite Plaintiff's reference to limited, discrete incidences of L.G.D.'s social skills deficits, there was ample testimony that these incidences were not reflective of his needs generally and that the needs he did exhibit were appropriately addressed by his IEPs. District staff, including his special education teacher and the school social worker, testified that they worked with L.G.D. on social skills based on outside recommendations and his needs (Tr. VI at 1275-80, 1420-22, Tr. VII at 1454-55).

Plaintiff states that on the last day of the administrative hearing in this case in June 2010, the school social worker, Sue Erndteman, produced a progress report with respect to L.G.D.'s 9/29/09 IEP, indicating that L.G.D. met his social and communication annual goals and objectives (Pl. Br., Dkt 63 at 22 citing Ex. 95 & Tr. VII at 1442-43). Plaintiff cites as contrary evidence, Erndteman's

testimony of some observations of L.G.D.'s social interactions during lunch and recess (Pl. Br., Dkt 63 at 22-23). These observations do not undermine the progress report or the IEPs. There is no question in this case that L.G.D. needed and received social skills services. Erndteman's observations were made in the course of her services to L.G.D. and in fact support the District's arguments that district staff worked to provide L.G.D. appropriate services based on his individual needs.

Plaintiff's argument that L.G.D. has not made the progress claimed by Shoreline Elementary staff, and her citation to the more recent, additional evidence admitted (Dkt 10) as support, is unpersuasive. While there is no doubt that L.G.D. continues to have special needs that will require individualized educational plans and services, that does not establish that his IEPs to date have not provided him a FAPE.

Plaintiff further specifically asserts that L.G.D. has failed to make academic progress. Plaintiff makes much of the fact that L.G.D. was not "promoted" to the first or second grade but instead was "administratively assigned" to the next grade for two consecutive years, "despite his failure to achieve grade level expectations" (Pl. Br., Dkt 63 at 11; Pl. SMF ¶ 52). The record establishes only that L.G.D. did not meet *all* grade level expectations, but he was nevertheless *appropriately* assigned to the next grade level (emphasis added; Exs. 73, 87; Tr. V at 968-73; Tr. V. at 1133, 1138-39). David Hundt, Shoreline Elementary principal, testified that many children, if they are not able to meet some of the grade level expectations, are "assigned" to the next grade (Tr. V at 972). Throne testified that she checked "assigned" rather than "promoted" because she did not feel that L.G.D. "had strongly met all the grade-level content expectations of second grade," and she explained that the designation is a red flag for the teacher next year that this child is going to

need extra support, whether it is from the general education teacher, the resource room teacher or the Title I program (Tr. V at 1104).

In view of the complete record, the ALJ's findings and conclusions must be upheld. Plaintiff has the burden of proving by a preponderance of the evidence that the IEP was inadequate. *N.L. ex rel. Mrs. C.,* 315 F.3d at 692. Plaintiff has failed to carry her burden. Contrary to Plaintiff's arguments, the complete record clearly establishes that L.G.D.'s IEPs were reasonably calculated to provide him a meaningful educational benefit gauged in relation to his potential.

## C. Relief

In her third issue raised on appeal, Plaintiff argues that the ALJ erred where he found significant procedural violations of the IDEA and a denial of FAPE, but failed to provide appropriate relief. She contends that L.G.D. is entitled to compensatory education because of the District's refusal to evaluate L.G.D. in a timely manner and to provide services needed to address his ASD during the last three school years. These claims are without merit.

The ALJ concluded that the procedural violation resulted in a denial of L.G.D.'s right to a FAPE for the period of mid-February 2008 until February 23, 2009 (Decision & Or. at 40). However, the ALJ further found that other than for the period from February 2008 to February 2009, L.G.D. was not denied a FAPE and "it otherwise appears from the record that the District has acted in conformity with its IDEA obligations to the student and his parents with regard to all issues raised in the course of this due process proceeding" (*id.* at 38).

The ALJ properly concluded that the appropriate remedy was compensatory education in the form of reimbursement to Plaintiff for expenses incurred in obtaining private therapy during that time frame because the District had largely prevailed in all other matters addressed in the due

process hearing. The ALJ awarded the expense of therapy obtained for L.G.D. from February 2008 (the time of the initial request) to February 2009 (the time the District completed the ASD evaluation). This consisted of treatment sessions with Anne Windberg, the therapist and psychologist at Pine Rest, which was in large part covered by the parents' medical insurance, although there was a ten dollar co-pay and incidental travel costs associated with the 40-mile round trip, for 17 treatment sessions between February 2008 and February 2009, which amounted to the $510.00 awarded to Plaintiff (Decision & Or. at 38-39).

Plaintiff complains that the ALJ "did not address or did not provide a remedy for the inappropriate denial of OT sensory integration therapy, or reimbursement for same, provided during that same period of time and thereafter, nor for psychological services provided from May 2007 – February 2008, and since February 2009 and continuing to date" (Pl. Br., Dkt 63 at 25). First, the ALJ did not find, and the record does not support Plaintiff's assertions that L.G.D. was denied such services as a result of the delay in conducting the multi-disciplinary evaluation. This is another example of Plaintiff advancing a false premise for her legal arguments. Plaintiff compounds this flawed basis for relief with the further unfounded assertions that (1) as a result of the asserted denial of services, L.G.D. "suffered academic and emotional consequences," (*id.* at 26) (2) private services were necessarily obtained by Plaintiff, and (3) she is therefore entitled to reimbursement for extensive compensatory education, including reimbursement for private services, such as psychological services from May 2007 to February 2008 and from February 2009 to date, and for private occupational therapy services since October 2009 to address L.G.D.'s sensory integration needs (*id.* at 25-26).

The record does not support Plaintiff's assertions that L.G.D. was denied additional needed services as a result of the procedural violation. Plaintiff's claims for reimbursement for OT services and for psychological services before any procedural violation, and after the procedural violation was cured, fail.

## V. PLAINTIFF'S REMAINING CLAIMS

Plaintiff's remaining claims concerning the MMSEA and § 504 of the Rehabilitation Act are deemed abandoned. On January 30, 2012, the Court granted Plaintiff's Motion to Submit a Revised Brief, and expressly ordered Plaintiff to review the factual and legal basis of her claims under the MMSEA and § 504 of the Rehabilitation Act of 1973 (Counts 5 and 6 of her complaint, case no. 1:-10-cv-1170) to determine whether these claims are proper and viable (Dkt 49). The issues and potential shortcomings in these claims were also expressly addressed on the record previously at the pre-motion conference. Plaintiff failed to comply with the Court's order to re-evaluate these claims and has set forth no viable argument on these claims. Accordingly, the Court declines to engage in analysis or further consideration of Plaintiff's purported claims under the MMSEA or the Rehabilitation Act.

## VI. CONCLUSION

For the foregoing reasons, the Court cannot conclude that the evidence before the Court "is more likely than not to preclude the administrative decision from being justified based on the agency's presumed educational expertise, a fair estimate of the worth of the testimony, or both." *See Woods*, 487 F. App'x at 973 (citations and internal quotation marks omitted). The additional evidence admitted does not warrant a different outcome with respect to the issues raised under the

standard for summary judgment. Plaintiff's Motion for Summary Judgment (Dkt 63) is denied. An

Order will be entered consistent with this Opinion.


Dated: March 28, 2013                    /s/ Janet T. Neff
                                         JANET T. NEFF
                                         United States District Judge